FIRST COMMUNITY BANK AND TRUST, as successor in interest to Bargersville Federal Savings Bank, Walter M. Umbarger, Merrill M. Wesemann, and Eugene W. Morris, Appellants–Plaintiffs,

v.

KELLEY, HARDESTY, SMITH AND COMPANY, INC., Larry D. Smith, and Garry Autry, Appellees–Defendants.

No. 41A04–9507–CV–261.

Court of Appeals of Indiana.

March 25, 1996.

A. Donald Wiles, II, Patricia Polis McCrory, Douglas A. Tresslar, Harrison & Moberly, Indianapolis, for appellants.

Karl L. Mulvaney, David C. Campbell, John F. Crowley, Bingham Summers Welsh & Spilman, Indianapolis for appellees.

1. Appellants, in their reply brief, assert that they are challenging the trial court's findings of fact nos. 7, 8, 11, and 12. However, each of these

## OPINION

CHEZEM, Judge.

### Case Summary

Plaintiffs–Appellants, First Community Bank and Trust ("the Bank"), Walter Umbarger ("Umbarger"), Merrill Wesemann ("Wesemann"), and Eugene Morris ("Morris"), collectively "Appellants", appeal the trial court's partial grant of Defendants–Appellees', Kelly, Hardesty, Smith and Company, Inc. ("KHS"), Larry Smith ("Smith"), and Garry Autry ("Autry"), collectively, "Appellees", motion for summary judgment. We reverse and remand for trial on the merits.

### Issue

Appellants present one issue for review, which we restate as: whether an accounting malpractice claim may be assigned by a client of the accountant to a successor of the client.

### Facts and Procedural History

There are no genuine material issues of fact in dispute.[1] KHS served as the Bank's external auditors. Smith was a partner and Autry an employee of KHS. In 1988, the Bank changed from its traditional base of real estate lending and began making consumer loans. Because the Bank was undercapitalized, it came under the close scrutiny of federal regulators, including the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC").

Eventually, the Bank entered into a Supervisory Agreement with the OTS to avoid liquidation. In addition, the OTS required the Bank to write off $94,649.00 in defaulted consumer loans which had been characterized as the Group "A" loans. At this time, the Directors were substantial owners of the Bank. They, Umbarger, Wesemann and Morris, purchased those non-performing loans from the Bank for $84,649.00 pursuant to a Loan Purchase Agreement executed on August 31, 1991. The Loan Purchase Agreement expressly assigned the Bank's interest in any causes of action related to the loans

are conclusions of law entered by the trial court, and not findings of fact.

sold to the Directors. Hence, the Appellants brought suit against KHS for malpractice in the performance of its audit of the Bank.

The Bank claimed that the loans failed due to acts or omissions of its consumer loan officer, Kerry Davidson ("Davidson"). The Bank discovered that Davidson committed certain "defalcations" such as destruction of bankruptcy notices and post-dating of loan due dates so that non-performing loans would not show up on the "slow moving" loan list. The Bank alleged that because this information was hidden by Davidson, it was not able to take appropriate steps to collect those loans. Further, the Bank alleged that KHS breached its duties by failing to prevent or discover through its audit what Davidson was doing. The Directors argued that, pursuant to the assignment, they stood in the shoes of the Bank with respect to those consumer loan losses.

The trial court granted in part KHS's motion for summary judgment. Relying on our supreme court's decision in *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338 (Ind.1991), the trial court found that, as a matter of law, the Bank's claim for malpractice against KHS could not be assigned to successive owners of the loans in question.

### Discussion and Decision

### I

■ Summary judgment is appropriate only if the designated evidentiary matter shows there is no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). In reviewing a motion for summary judgment, we must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *Cloverleaf Apartments, Inc. v. Town of Eaton,* 641 N.E.2d 665, 667 (Ind.Ct. App.1994). We apply the same standard as the trial court. *City of Evansville v. Moore,* 563 N.E.2d 113, 114 (Ind.1990).

■ The party seeking summary judgment bears the burden of establishing the propriety of the motion. *Miller v. Monsanto Co.,* 626 N.E.2d 538, 541 (Ind.Ct.App.1993). All facts and inferences from the designated evidentiary matter must be liberally construed in favor of the nonmoving party. *Terre Haute First Nat. Bank v. Pacific Employers Ins. Co.,* 634 N.E.2d 1336, 1337 (Ind. Ct.App.1993). A trial court's grant of summary judgment is "clothed with a presumption of validity." *Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 434 (Ind.1993). However, this court must carefully scrutinize the trial court's decision to ensure that the losing party is not improperly denied his day in court. *Oelling v. Rao,* 593 N.E.2d 189, 190 (Ind.1992).

### II

■ The question we consider here is whether an accounting malpractice claim can be assigned by a client of an accountant to a purchaser of accounts audited by the accountant. We answer yes. When an accountant who is serving as an external auditor issues an opinion regarding financial statements, and accounts are audited to produce the financial statement, any malpractice claim associated with the production of the financial statement and opinion of the accountant may be assigned with the purchase of the business or the assets included in the audit.

### 1. Accountant–Client Relationship

KHS successfully argued to the trial court that claims for accountant malpractice are similar to claims for legal malpractice and, hence, our supreme court's holding in *Picadilly* applies. The Court in that case based its decision that legal malpractice claims should not be assigned on its concern about two issues: "the need to preserve the sanctity of the client-lawyer relationship, and the disreputable public role reversal that would result during the trial of assigned malpractice claims like this one." *Picadilly,* 582 N.E.2d at 342.

### A. Duty of Loyalty

The Court held that assignment of legal malpractice claims would weaken two standards that define the lawyer's duty to the client: the duty to act loyally and the duty to maintain client confidentiality. *Id.* Specifically, an attorney's duty of loyalty would be undermined by the knowledge that a client

could sell his malpractice claim to an adversary. This might chill attorneys' desires to be zealous advocates for their clients, something they are otherwise duty-bound to do. Additionally, assignments could become bargaining chips in negotiations of settlements: "An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney." *Id.* at 343. Hence, the interest of the lawyer would be adverse to the interest of the client.

KHS argues that an accountant-client relationship is similar and that to allow assignment of such malpractice claims would create conflict between an accountant's self-interests and his duty of loyalty to his client. However, there is one crucial difference. An accountant, though imposed with a duty of loyalty to clients, is not an "advocate" for clients in an adversarial system. The facts in *Picadilly* arose purely because an adversary was able to gain assignment of a legal malpractice claim against a previous opponent's attorneys. The claim of malpractice arose from the adversary's original claim against his opponent. Such is not the case between the Directors and KHS.

Unlike the assignee in *Picadilly*, the Directors' interests were never adverse to the Bank's, from which they received their assignment. The assignee in *Picadilly* gained his assignment from a previously adverse party and, moreover, was never a successor in interest in anything except for the malpractice claim. The Directors were successors in interest to the Bank on the notes that they purchased from the Bank. When they bought the notes, they stood in the position of the Bank. Thus, the interest acquired with the notes included the claim for malpractice with regard to the audit of the notes.

KHS argues that a potential purchaser of an accountant's client's business might increase his offer for the business in exchange for the assignment of that client's right to bring a malpractice claim against the accountants. This assumes the Directors were aware of KHS's malpractice when they purchased the notes. No evidence has been presented nor arguments made which would indicate such was the case. Even if the Directors knew of KHS's malpractice before they purchased the notes, KHS has not demonstrated why compensating for a malpractice claim in a purchase agreement would be deleterious. The existence of a malpractice claim could affect the value of any asset. Accordingly, we reject the argument that accountant malpractice claims should not be assignable because of an accountant's duty of loyalty to his client.

### B. Duty of Confidentiality

Secondly, the Court in *Picadilly* noted that a lawyer's duty to maintain confidentiality of the client would be compromised by assignment of legal malpractice claims. When a lawyer is sued by a client, the lawyer may reveal confidential information within reason to establish a defense. The client may drop the claim, thereby preserving the confidential information. The Court in *Picadilly* noted that if a client no longer controls the claim due to assignment, the attorney may still reveal client information in his defense but the client has no power to discontinue the claim. Thus, such assignments should not be allowed.

Likewise, KHS argues that the sanctity of the accountant-client relationship should be preserved because it is a fiduciary relationship and it is personal in nature. In the same vein, KHS notes the accountant-client privilege and an accountant's duty to maintain the confidentiality of a client. In contrast to the attorney-client privilege, the common law recognized no privilege for communications between accountants and their clients. *Ernst & Ernst v. Underwriters Nat'l Assurance Co.*, 178 Ind.App. 77, 381 N.E.2d 897 (1978). Instead, the accountant-client privilege is purely the creation of a statute passed in 1969. I.C. 25-2-1-23. (Recodified, effective January 1, 1994, as I.C. 25-2.1-14-1 and 2).

The lack of any common law privilege limits the application of the statutory privilege. As explained in *Ernst*, evidentiary privileges generally are looked on with disfavor, and "certain specific privileges such as the accountant-client privilege, which were

unknown at common law, are particularly disfavored, and are therefore strictly construed in order to limit their application." *Ernst*, 381 N.E.2d at 901.

KHS correctly states the accountant's duty of client confidentiality. However, unlike the attorney, the accountant's duty of confidentiality is not rooted in other duties of the accountant. In other words, the privilege is the client's and the client may waive the privilege in bringing an action of malpractice against the accountant or in assigning that claim of malpractice to another. To the contrary, the attorney-client privilege is rooted in not only the confidentiality of a client but also in an attorney's duty to be a zealous advocate for the client, which is an independent and equally important duty imposed on attorneys. An attorney cannot be a zealous advocate for his client if he reveals confidential information about the client. It is *only* when a attorney becomes an adversary of the client via a malpractice claim that the attorney may suspend his duty of zealous advocacy and may avoid his duty of confidentiality, and only to the extent necessary to reasonably defend himself in the action.

█ The accountant, on the other hand, has no duty of confidentiality rooted in a duty to be a zealous advocate. The accountant's duty of confidentiality is based solely on the intrinsic value of confidentiality to the client. A client, in selling a business or asset of the business, should have disclosed the confidential information regarding that asset or business to the purchaser.[2] Moreover, it should be the case that when a seller sells an asset or business to a buyer, the buyer should have every opportunity to receive the full value for his purchase. Thus, a seller should be aware that with the asset goes any confidential information related to that asset, to the extent such information will enable the buyer to obtain maximum value for his purchase. There is a great difference when the

claim for malpractice is merely incidental to the central asset being sold. In essence, when a seller sells any asset that is not a claim for malpractice (as was not the case in *Picadilly*, where the malpractice claim was itself the asset), he automatically waives his accountant-client privilege with regard to any matters affecting the value of that asset. This means that when there is a claim for accountant malpractice relating to the asset being sold, then the asset and the claim for malpractice may also be assigned to the buyer.

### C. Commercialization

KHS argues that to allow that assignment of accountant malpractice claims would lead to commercialization of such malpractice claims, as disapproved in *Picadilly*. Commercialization of such a product is disastrous in a legal setting where adversaries could control the outcome of underlying litigation by purchasing malpractice claims against their opponents. In essence, it could render their opponents puppets on a string, which flies in the face of almost every attorney duty to a client. KHS does not demonstrate, in the case of an accountant malpractice claim, how harm would occur. The Directors received the assignment of the malpractice claim when they purchased the notes. There is no threat of commercialization when an assignment of an accountant malpractice claim is incidental to the purchase of assets which give rise to the claim, such as the notes purchased here.

### D. Role Reversal

Our supreme court in *Picadilly* also examined how assignment of legal malpractice claims can have a disreputable effect of role reversal during the malpractice trial. For instance, the plaintiff in the *Picadilly* trial had to prove that the defendant caused his injuries. The same plaintiff, if allowed the

---

2. There may be a case in which the seller is not completely forthright with the buyer. For example, the seller may want the sale to proceed but on the seller's terms and not the buyers. Or, the seller is hostile to the buyer and does not want the sale to proceed, such as when there is a hostile takeover of a corporation. In both cases, the seller may withhold confidential information in an effort to control or even prevent the purchase. It would be the seller, and not the accountant, or maybe both parties who would be liable to the buyer. The seller, in defending an action of fraud, etc. against such a buyer, may assert the accountant's liability, thereby voluntarily suspending the seller's privilege.

assignment of the original defendant's legal malpractice claim, would have to prove that it was the defendant's attorneys, and not the defendant, who were responsible for the erroneous outcome in judgment. The plaintiff, as assignee, is in a precarious position of arguing conflicting positions at the same time. Not to mention that the plaintiff increased its chances of recovery two-fold, regardless, either in asserting the original tort action or, subsequently, in asserting the claim of malpractice. Potentially, such a plaintiff could recover two judgments relating to the same case. Fortunately, we are not presented with this unique circumstance when a claim for accountant malpractice is assigned.

### 2. Privity of Contract

KHS argues that Indiana law requires privity of contract to successfully maintain an action for accounting malpractice. Although KHS presented this question of law to the trial court in its motion for summary judgment, the trial court did not reach that question because it held the Directors were not entitled to judgment as a matter of law for another reason. Because we stand in the shoes of the trial court in reviewing the grant or denial of a motion for summary judgment and because we reversed the trial court on its conclusions of law with regard to the accountant-client privilege, we must examine KHS's claim of no privity.

Contrary to what KHS asserts, the law of privity with regard to accountant malpractice claims is not well-settled in Indiana. Like legal malpractice claims, accountant malpractice claims resemble both a claim arising out of contract for personal services—which generally is not assignable—and a claim based on tortious injury to personal property—which generally is assignable. There have

been no Indiana cases which hold that privity is required to bring an action for accountant malpractice.

In *Essex v. Ryan,* 446 N.E.2d 368 (Ind.Ct. App.1983), a purchaser of real estate filed suit against a surveyor who allegedly conducted an inaccurate survey for the prior owner. We held that because there was no personal injury to consumers, there should be no exception to the privity requirement. *Id.* at 372–73. In reaching that holding, we relied on Judge Cardozo's opinion concerning accountants in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). Judge Cardozo reasoned that the absence of any privity requirement would expose accountants to liability in an indeterminate amount for an indeterminate time to an indeterminate class. For those same reasons we declined to extend the exception to the privity requirement against surveyors in the *Essex* case.[3]

However, we decline to follow *Ultramares* and *Essex* because the facts of those cases are not comparable to the facts before us today. The facts before us today do not contain an issue of privity. There was a pure assignment of rights. The Directors stood in the shoes of the Bank after they completed the assignment. There was not an assignment of rights in *Toro, Ultramares* or *Essex.* Rather, those cases attempted to answer the question of when a third party may sue a professional when there has been no assignment by purchase.

Under the *Ultramares* standard, before accountants may be held liable for negligence to non-contractual parties who rely to their detriment on an inaccurate financial report, certain prerequisites must be satisfied. First, the accountant must have been aware that the financial reports were to be used for

---

**3.** The applicability of the privity requirement to accounting professionals was considered by the United States Court of Appeals for the Seventh Circuit in *Toro Co. v. Krouse, Kern & Co., Inc.,* 827 F.2d 155 (7th Cir.1987). In that case, the creditor of a client of an accounting firm brought an action against the firm and individual accountants, alleging that it relied upon erroneous audits in extending credit to the client. The District Court entered summary judgment in favor of defendant and the creditor appealed. The

question for the Court of Appeals concerned the appropriate standard of care required for accountants under Indiana law.

The *Toro* court isolated three standards utilized by courts throughout the nation. These standards may be classified as: (1) the *Ultramares* standard; (2) the Restatement standard; and (3) the "reasonably foreseeable" standard. The *Toro* court noted that because the *Essex* court relied on *Ultramares,* then that standard should be applied to the facts in *Toro.*

a particular purpose or purposes. Second, a known party or parties were intended to rely upon the financial report. Third, there must have been some conduct on the part of the accountants linking them to that party or parties, which evidences the accountant's understanding of that party or parties' reliance. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985).

The *Ultramares* standard might be acceptable when noncontractual, non-assignee parties seek redress. However, it is important to note that Indiana courts have never adopted the *Ultramares* standard for accountants. We adapted the *Ultramares* standard in the *Essex* case when the liability of a surveyor to a third party was at issue. We specifically limited our holding in that case to the facts of that case. *Essex*, 446 N.E.2d at 373. We held in *Essex* that a third party's reliance on erroneous survey results is not a physical injury and therefore the surveyor is not liable. Additionally, because the surveyor had no knowledge that the third party would rely on the results, there was no privity between the surveyor and the third party. *Id.* at 374.

Thus, although somewhat dispositive of the issue of whether a third party who lacks privity may sue an accountant for malpractice, the case law to date has not addressed the question of whether an accountant malpractice claim may be assigned.

External auditors are hired to provide representations for the client and they are fully aware when they produce their opinions that potential buyers will rely on the audit results. It is imperative that reasonably foreseeable parties who rely on an accountant's opinion have confidence in the opinion of an external accountant. The rules of independence for auditors, to which surveyors are not subject, are rooted in the goal of enhancing credibility in the opinion that those accountants produce. Otherwise, there would be little use for external auditors. Accountants have a responsibility to accurately reflect the business they audit. An accountant's representations about the financial statements of a company may be relied on by a buyer to complete a purchase of an asset or business. We find that an assignment of claims is permissible when a party reasonably relies on the statements to purchase the business or business asset included in the audit.

The assignment of claims of accountant malpractice should not be prohibited in instances where there is reasonably foreseen reliance on the accountant's opinion by the assignee.

Reverse and remand for trial on the merits.

DARDEN, J., concurs.

BAKER, J., concurs with separate opinion.

BAKER, Judge, concurring.

While I agree with the result reached by the majority, I want to make clear that my concurrence is based upon the unique facts of this case, namely that the third party Directors were in fact substantial owners of the Bank, who was the client of the accountant. Although I am not in favor of permitting the assignability of malpractice claims to third parties, *see Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 339 (Ind.1991), in light of these specific facts, I agree with the majority's ultimate conclusion that the assignment of the accountant malpractice claim should not be prohibited here as it was reasonably foreseeable that the third party Directors would rely on the accountant's opinion. Therefore, I concur in result.